We'll hear argument this morning, Case 18-13-23, June Medical Services v. Russo, and the cross-petition, 18-14-60, Russo v. June Medical Services. Ms. Rinkleman? Mr. Chief Justice, and may it please the Court, this case is about respect for the Court's precedent. Just four years ago, the Court held, in Whole Woman's Health, that the Texas Admitting Privileges Law imposed an undue burden on women seeking abortions. The Louisiana law at issue here, Act 620, is identical to the Texas law and was expressly modeled on it. After a trial, the District Court ruled Act 620 unconstitutional, finding no material differences between this case and Whole Woman's Health. On burdens, it found that Act 620 would leave Louisiana with just one clinic and one doctor providing abortions. At the same time, it found that Act 620 would do nothing for women's health. In reversing the District Court's decision, the Fifth Circuit committed two fundamental errors. First, it usurped the role of the District Court and disregarded nearly all of its factual findings. Second, the Fifth Circuit accepted legal arguments that this Court rejected four years ago. Nothing, however, has changed that would justify such a legal about-face. In fact, even more medical organizations have joined the AMA and ACOG to say that admitting privileges impose barriers to abortion with no benefit to patients and that this impact is not state to third-party standing runs up against still more binding precedent. The Court squarely held in Craig v. Boren that such objections are waivable, and the State deliberately and strategically waived the issue in the District Court. And even if the State could get past waiver, denying standing here would contradict decades of this Court's precedent in numerous areas of law. In short, petitioners have third-party standing, especially because Act 620 restricts abortion by regulating them rather than their patients. Would you have done anything different if the third-party standing had been timely raised? Your Honor, we certainly could have submitted additional evidence in the Court, but we believe that the evidence that is already there is sufficient to find third-party standing. This Court has squarely found third-party standing in at least four abortion cases that are on point, as well as a number of other cases such as Meyer, Craig, Carey. And the Court's cases have been consistent in saying that a plaintiff who is directly regulated by a law has third-party standing. Would you agree with the general proposition that a party should not be able to sue ostensibly to protect the rights of other people if there is a real conflict of interest between the party who is suing and those whose rights the party claims to be attempting to defend? No, Your Honor, not if that party is directly regulated by the law in question. And in fact, this Court has allowed third-party standing in cases where the State argued that the third parties were protected by the law and, in a sense, protected from the plaintiff. Really, that's amazing. You think that if the plaintiff actually has interests that are directly contrary to those individuals on whose behalf the plaintiff is claiming to sue, nevertheless, that plaintiff can have standing? If the plaintiff is directly regulated by the law, this Court has allowed an attorney to bring third-party claims against a statute that capped attorneys' fees in favor of clients. Well, that's amazing. I mean, suppose — I know you think that the admitting privileges requirement serves no safety purpose, but suppose that the regulation that was being challenged was one that a lot of people might think really did serve a safety purpose. Let's say we're in a state where physicians' assistants can perform abortions, and an abortion clinic wants to challenge the training requirements for physicians' assistants. It just thinks those are too onerous and there's no justification for them. Now, if they're wrong about that, it implicates the interests of the plaintiff. And if the plaintiff is the one directly regulated, then it makes sense that they are the appropriate plaintiff. And that's clearly true. That sounds like a direct standing, not third-party standing. But in this case, is there anything like the conflict that Justice Alito had mentioned? Is there a conflict? No, Your Honor. There is not even a plausible conflict in this case, because this Court already held that admitting privileges serve no medical benefit. And the district court here, after a trial, specifically found that this law would serve no benefit and, in fact, would harm the health of women in Louisiana. But, you know, your argument is using the merits to support standing. There's a serious problem with that. No, Your Honor. I believe it's the state that's collapsing standing and merits. And again, this Court has allowed third-party standing in cases where one could argue that the state law was protecting third parties from the plaintiffs. In addition to Triplett, that was the issue in Craig v. Boren. The law there was a state law in Oklahoma, and the state claimed that it was designed to protect young men from buying beer in order to make sure that they were safe and didn't get into traffic accidents. Counsel, I'm just wondering, are these doctors in any different position than potential plaintiffs' women who feel burdened by this law? No, Your Honor. And, in fact, the state has not pointed to a single thing that would have been different if one woman had been joined in this lawsuit. To the contrary, the issues that the health and safety benefits and how difficult it is for physicians to obtain privileges are issues that the physicians are particularly well-suited to litigate. And again, this is a law— So the point is you have standing on behalf of those women who feel burdened. Yes, Your Honor. To the extent that other women may not have brought a suit, that's irrelevant to the fact that there are some, those burdened, who could have and would have if situations had permitted them to. That's absolutely right, Your Honor. Well, then why can't, why shouldn't they be the ones to bring suit? Your Honor, this is a law that restricts abortion by regulating the physicians rather than their patients. And so it's appropriate for them to be the plaintiffs here. Again, the state has pointed to— The constitutional right at issue is not a constitutional right of abortion clinics, is it? It's a right of women. That's correct, Your Honor. But in order for women to access their right to abortion, they need to be able to access those services. But do you think a party can have third party, there can be third-party standing if there is no hindrance whatsoever to the bringing of suit by the people whose rights are at stake? This Court has allowed third-party standing in cases where the law directly regulates the plaintiff without a showing of hindrance. For instance, in Craig v. Boren, there was clearly no hindrance. But I would also say that the Court doesn't need to reach these issues here because the state strategically and deliberately waived third-party standing. Well, I think that's highly debatable that they waived it. They certainly didn't raise it in the district court. But whether they affirmatively waived it is quite debatable. Your Honor, at JA 45, the state explicitly conceded third-party standing and urged the district court to reach the undue burden claim, saying that it had a keen interest in removing any cloud upon the validity of its law, that this case was the proper vehicle for doing so. It's a highly debatable interpretation of that passage, which I've read numerous times. What the state was saying was that if a temporary restraining order was issued, the lawsuit should continue to go forward. And they said there wouldn't be an impediment to the lawsuit going forward because the doctors would have standing. And what I think they may have been saying in that instance is that they would have standing under the law that was applicable at that time. And we could debate what was actually said, but I think it's quite a stretch of the record for you to say there was an affirmative waiver. Your Honor, at JA 45, there was a deliberate waiver. And the state did it strategically because it was attempting to take advantage of favorable Fifth Circuit precedent at the time because the Fifth Circuit had just upheld the Texas admitting privileges law. Again, the state specifically urged the district court to decide the undue burden claim, saying that this case was the proper vehicle for resolving the constitutional issues and that any delay wouldn't serve judicial efficiency. It wasn't raised in the district court or in the Court of Appeals. It was a craft up in a and wasn't it a cross petition for cert? That's correct, Your Honor. And might you have, if you had a timely notice just as insurance, joined in a patient or two? Yes, Your Honor. And fact, it would be profoundly unfair to allow the state to raise the objection for the first time five years into this litigation after it urged the district court to decide the undue burden claim and then pursued the undue burden claim through multiple rounds of appeals. It didn't even raise the issue when this case came before the court in 2016 on the stay. The first time that it raised an objection was when it filed its cross petition for cert. And again, at JA 45, it deliberately and strategically waived this issue. How many abortion cases has the court either expressly or silently allowed the doctors to sue on behalf of the women? I counted eight, but maybe that's overstating it. How many abortion cases in this court? At least eight, Your Honor. And I believe at least four of them squarely allowed standing in precisely these circumstances. So if we didn't in this case, it would require either directly or indirectly overruling eight cases of this court. That's correct. And in fact, in Danforth and Akron, the same type of law was at issue. It was a law that the state claimed was designed to protect the health and safety of women, but the court allowed the physicians to bring the claim and to show that in fact, the law didn't further health and safety. And how many of those cases did the court discuss the issue of conflict of interest? The court in Danforth specifically said that the plaintiffs had standing. It wasn't discussed in terms of the words conflict, Your Honor. But again, the same types of arguments were in front of the court because the state- Was it a footnote in Danforth? I don't believe so, Your Honor. I believe it was a footnote in Akron, but in Danforth it was- You made a point about Craig against Warren that the ostensible purpose of the law was to save the vulnerable young men from the evils of 3.2 BR. That's correct, Your Honor. And the court allowed the saloon keeper to bring the third-party standing claim. Again, in Triplett, the court allowed an attorney to challenge a law designed to cap attorneys' fees. And in Cary, the court allowed a mail order contraceptive company to challenge a law that was designed to limit the prescription of contraceptives to pharmacists. Again, claiming that that was about protecting the health and safety of people. So the court has allowed third parties standing in many cases that are squarely on point. Counsel, do you agree that the inquiry under Hellerstadt is a factual one that has to proceed state by state? Your Honor, I think that facts may vary, but what we know is that the district court held a trial here and found that there were no material differences between this case- No, no, I know. But if the issue, the statutes are on the books in other states. And if the issues are raised there, is the same inquiry required in each case? You have to have the district court examine the availability of specific clinics and the admitting privileged doctors so that the litigation could be, the results could be different in different states. Two points, if I may, Your Honor. This court held in Holdman's Health that the Texas admitting privileges law was medically unnecessary and its burdens were undue. That holding should clearly apply to Louisiana's identical law. And certainly the court's reasoning is applicable in Louisiana. Now the burdens of a law may vary, but a law that has no benefits and doesn't serve any valid state interest is much more likely to impose an undue burden. If a state passed an admitting privileges law, therefore, and suppose a state had 10 clinics and two doctors for each clinic, but all 20 doctors could easily get the admitting privileges so that there'd be no effect on the clinics, no effect on the doctors who perform abortions, and therefore, no effect on the women who obtain abortions. Would a law be constitutional in that state? That law may still be unconstitutional if it's restricting access because of the 30 mile limit, Your Honor. But that's very different from the situation here where the district court concluded- If it didn't, I'm sorry to interrupt. If it didn't, though, put aside the 30 mile, assume all the doctors who currently perform abortions can obtain admitting privileges. Could you say that the law still imposes an undue burden even if there were no effect? That law would have no benefit, Your Honor, and it may pose a much harder question than this case. But in this case, the district court, after a trial, explicitly found that the burdens of this law would be severe, and it would leave only one physician to serve 10,000 people per year in the entire state. Well, the Fifth Circuit went through what the district court had said about the various doctors, and it was proper for the Fifth Circuit to review the district court's findings for clear error, was it not? Yes, Your Honor. Clear error is the standard, and we believe that the district court's findings are more than plausible under the standard here. Let's take one example. Let's take Doe Number Two. Doe Number Two is a plaintiff in this case, right? Yes, Your Honor. So he had, he didn't have, it would be counter to his own interests for him to make a super effort to get admitting privileges, wouldn't it? Because he'd be defeating his own claim. No, Your Honor. Doe Two brought this lawsuit to protect the rights of his patients, and the district court found that he was competent and qualified, and that he made good faith efforts. All right, so if, all right, we can argue about whether he had a conflict of interest or not. He previously had admitting privileges at a hospital in the Shreveport area, did he not? Yes, Your Honor. The predecessor of Christus Schumpert? Yes, Your Honor. He testified that he didn't apply for admitting privileges there because it's a Catholic hospital, isn't that right? That was part of the testimony, but in addition, the bylaws of that hospital showed that there would be admissions requirements that Doe Two couldn't meet. All right, well, he testified directly, I did not apply there because it's a Catholic hospital, is that not correct? That's correct, Your Honor. All right, Doe Number Three performs abortions, does he not? Yes. Doe Number Three has admitting privileges there. He has admitting privileges that require 50 admissions per year, which he's able to satisfy because he has an obstetrics practice, and that's why he was the only physician with privileges. The state's own credentialing expert in this case conceded that outpatient physicians like these who never intend to treat patients in the hospital will not be able to get privileges, and the hospital bylaws included many criteria that these physicians could never satisfy, including residency. When Doe Number Two explained why he didn't apply to this hospital, he said in part because it's not a place where I would feel comfortable. Didn't he say that? He did, Your Honor. Doe Two focused his efforts on hospitals where he thought he had the best chance of obtaining privileges. He had had privileges at LSU and wasn't even able to get privileges there. Did the district court mention any of these facts? Yes, Your Honor. The district court's opinion was very careful, and its decision and finding that these physicians would not be able to get privileges was based on at least four points. One, the fact that they applied and attempted to get privileges at 15 hospitals over one and a half years. Two, that the state's key credentialing expert conceded that physicians who never intend to treat patients in the hospital will not get privileges. Footnote, that's Dr. Number Six. All of these physicians are outpatient physicians, Your Honor. No, but Number Six is only a medical doctor. That's correct. He hasn't done any surgical procedures since 2004 and 2005. That's correct, and the state's expert also conceded that a physician who provides only medication and counseling would never be able to get privileges. In addition, the district court's burdens findings were supported by what happened when this law actually took effect for a brief time in 2016, and abortion access in Louisiana was devastated. Of course, the finding of every district court that has held a trial on a similar law has been that these laws will restrict access to abortion, and here the district court found that this law would leave Louisiana with just one clinic in one state to serve about 10,000 people per year, and that would mean that hundreds of thousands of women would now live more than 150 miles from the closest provider, and the burdens were actually more severe than this court found in Holman's Health. Can I go to Doe Three, the part-time doctor in Hope? That's correct. There's been much talk about his statement or findings by the district court that he was a superseding cause to the act because he, on his own, will not practice in that in Hope if this law goes into effect because he would be the only doctor, but putting that aside, he also testified, I'm sorry, the Hope manager testified that he only does a limited number of abortions, and without the other doctor, that clinic would have to close. That's absolutely right, your honor. The district court found that without Doe One, the primary testimony, Hope would have to close because Doe Three was providing fewer than 30% of the abortion services in that clinic. The primary provider was unable to get privileges, and Hope would close, meaning that women living in northern Louisiana would now have to travel hundreds of additional miles for a law that has no benefit in order to access abortion services. There is no dispute here about Doe One. That's correct. The other side, that finding, it says it's right. Now Doe Three, whether or not he would quit or not, the clinic would have to close because it wouldn't have a Doe One. Correct. So at least with respect to that, with respect to Doe Six, that's a medical doctor only who hasn't been in a hospital for over 10 years, so it seems implausible given that every single hospital mentioned by the district court in that doctor, and he can't fulfill that under any circumstance. That's correct. Can I follow up on the Chief Justice's earlier question and mine as well? Are you saying that admitting privileges laws are always unconstitutional, such that we don't have to look at the facts in state by state? Or are you saying that actually you do look at the facts state by state, and in some states, admitting privileges laws could be constitutional if they vary, but a law that has no benefit and serves no valid state interest, which is what this court held in Holman's Health, is much more likely to be an undue burden. Could an admitting privileges law of this kind ever have a valid purpose in your view? No, Your Honor. The medical consensus against these laws is clear. So your view is that they're unconstitutional in any state, regardless of the facts? They certainly serve no valid state interest, and in fact, the district court here found that this law was a solution for a problem that didn't exist and would actually jeopardize the health and safety of people. Would this be different if they did something as limited as, for example, you have to be admitted somewhere, because being admitted somewhere does further credentialing benefits. But this was, you have to be admitted within 30 miles. Some of these doctors were admitted further away, but they still were credentialed by someone, correct? That's correct, Your Honor. If credentialing were the true goal of this law, the 30 mile limit would make no sense. And one of the practical real world impacts, if this law were to take effect, is that women in the Baton Rouge area would now have to travel 320 miles back and forth to New Orleans to see the same exact physician that they previously could have seen in Baton Rouge. How many miles from the northern, from the Hope area? It's 320 miles, Your Honor, from Shreveport to New Orleans. And from Baton Rouge back and forth, because of the true trip law, it's 320 miles. And again, they would be making that trip to see the same exact physician who had been previously providing services in Baton Rouge, and that has no benefit to women's health. It will only hurt their health, which is exactly what the district court found here. You haven't mentioned it's an odd 30 miles from the clinic when most of these abortions don't have any complications, and the patient never gets near a hospital. But if she needs a hospital, it's certainly not going to be the one near the clinic. She will be home. That's exactly right, Your Honor. That's what this court recognized in women's health. And one of the reasons why it concluded the law is medically unnecessary, because the complication rate is extremely small to begin with, but when complications do occur, it's almost always after the woman has left the clinic. And the standard of care at that point is for her to go to the hospital closest to her home. And of course, about 40% of abortions in Louisiana are medication abortions, and any complication from those abortions will always happen when the patient is at home, which again is what this court recognized in women's health. And that is one of the reasons why the AMA and ACOG are clear that these laws have no medical benefits whatsoever and only impose barriers to abortion. And that is true in every state, regardless of the state circumstances. These laws will always put barriers to abortion while serving no health and safety benefits. And in fact, the district court here found that abortion in Louisiana in the years before the law was extremely safe with a very low rate of complications, that HOPE had an excellent safety record, and that its physicians were competent and qualified to provide abortion services. And again, it concluded that there is no basis to distinguish this case from Holman's Health, and instead the burdens of this law would be even more severe than the Texas law that this court struck down in Holman's Health. HOPE is the name under which June Medical does business, is that correct? Yes, Your Honor. Was June Medical's license suspended for regulatory violations? It was briefly, Your Honor, in 2010. And the court heard testimony about that and rejected the state's allegations after listening to the clinic's administrator and looking at the evidence in the record. It concluded that HOPE has an excellent safety record and that its physicians are qualified and competent. Thank you, counsel. General Murrell. Thank you, Mr. Chief Justice, and may it please the court. The Fifth Circuit correctly held that the plaintiffs in this case failed to carry their burden, their heavy burden of proof that is required to facially invalidate a state law. Louisiana's decision to require abortion providers to have admitting privileges was justified by abundant evidence of life-threatening health and safety violations, malpractice, noncompliance with professional licensing rules, legislative testimony from post-abortive women, testimony from doctors who took care of abortion providers' abandoned patients. The substantive due process claim that plaintiffs assert on their patients' behalf hinged upon their assertion that they would not be able to get privileges. But they can, and they did. Their claims also fail for an independent reason. So they do not meet the modern rigorous rule for third-party standing. So instead, they invite this court to exempt them from the rule. This court should decline to make abortion providers unique among federal plaintiffs and reaffirm that even abortion providers must comply with the same rules as all the other litigants. Doctors and health care providers and health care facilities are heavily regulated for ethics reasons and for consumer protection. And in this context, the conflict between the plaintiffs and the individuals that the law seeks to protect should defeat the close relationship prong of third-party standing. Apart from that conflict, the record shows that they do not have a close relationship with their patients, and individual women have litigated abortion cases on their own for decades. I'd like to first address why this case is different from Hellerstedt and then address standing and waiver. The state presented abundant evidence of how this case is different. The law was different, the facts are different, the regulatory structure is different, and the record is different. And all of those things dictated a different result. So the Fifth Circuit focused on one of the things that the Fifth Circuit focused on was credentialing. The record in this case demonstrates that there is no credentialing that is performed by these facilities. They alleged that they had robust policies, but they don't read them and they don't follow them. What sense does the 30-mile limit make, considering that certainly for medication abortions and for the overwhelming number of other abortions? If the woman has a problem, it will be her local hospital that she will need to go to for the care, not something 30 miles from the clinic, which does have no necessary relationship to where she lives. Justice regulations and our ambulatory surgery regulations, so it is consistent with our regulatory structure. We also had evidence in the record of women who did require transfers. I think there is at least 03 testified unambiguously that he had to transfer four patients who had punctured uteruses and were hemorrhaging. And he took care of them. What about a DNC after a miscarriage? As I understand it, these two procedures are very much alike. Are similar regulations about 30 miles and admitting privileges applicable to a DNC following a miscarriage? Under the ambulatory surgery center regs, yes. Under the office practice regs, which do not regulate abortion clinics, a doctor who doesn't have a residency in the proper scope of care would have to have admitting privileges and would have to have them within 30 mile radius of the clinic. So it's the same requirement. It is the same. I thought there was something in the record suggesting there was no such requirement for a DNC following a miscarriage. The office practice regulations are not as tightly regulated as ambulatory surgery centers, which are facility licensing. These are separate licensing constructs. Facilities are licensed by the Louisiana Department of Health as our ambulatory surgery centers, and both require all the medical staff to have admitting privileges. The requirement under ASC says geographically close, and it is interpreted under the regs as the same way. So we don't interpret it differently. We're applying them consistently and we're reading those regulations the same. Do you agree that the benefits inquiry under the law is going to be the same in every case, regardless of which state we're talking about? I mean, I understand the idea that the impact might be different in different places, but as far as the benefits of the law, that's going to be the same in each state, isn't it? No, I don't think the benefit ‑‑ I mean, I think that a state could certainly show greater benefits depending on what their regulatory structure is and what the facts are on the ground in that state. I think we absolutely could show that it serves a greater benefit. In our situation, for example, we've demonstrated that the doctors don't do credentialing, that the LSBME testimony from the executive director, from Dr. Mouton, in the record, at JA1373, she testified specifically that the LSBME doesn't do credentialing for procedures. That's what the hospital would do, and that's what, if the clinic had robust policies, it would do. I'm sorry, there are laws that require credentialing to be done by the state with respect to these doctors, correct? They have to get a license, and they have to have certain competencies to get the license, and they also ‑‑ the license is suspended if they're committed ‑‑ if they're convicted of a criminal act. You're making it sound like there is no state licensing of these doctors. They're licensed. They are regulated. They are licensed by the state, and Dr. Cecile Mouton testified specifically at JA1373 that the board does not do credentialing. That is not our role. But didn't they also testify that they ‑‑ but they did ensure that each of these doctors was skilled in the procedures that they were performing? No. In fact, Doe 3 hired a radiologist and an ophthalmologist to perform abortions at one point in time. So they clearly were not ‑‑ But he was supervising what they were doing. That's what he testified to. That is not within the scope of care, and our record clearly demonstrates that you should have a residency and you should have training in the area in which you are performing surgical procedures. So it would not comply, even with our office practice regs, for a doctor to ‑‑ a radiologist to perform abortions. That would not comply with our standards. Was he doing a surgical procedure, or was he doing medical abortion? He was performing surgical abortions, to the best of my knowledge. There's no indication that he wasn't. I believe that the testimony is that he was performing all ‑‑ he wasn't restricting his practice. There's not a lot of testimony in the record about what those doctors were doing, other than he hired them. But to your question ‑‑ We're not even talking about them. We're talking about these doctors and their credentials. And I don't ‑‑ and I'm sort of still at a mystery to me why, if what's important to you is the credentialing, why the 30‑mile limit has significance. Because it's not just credentialing. It is all of the other factors that also play into it. It does provide continuity of care. It does cover for ‑‑ it does address the noncompliance with health and safety regulations. There is no continuity of care. This law itself permits a doctor to either have admitting privileges or to be in contract with in a hospital. The only thing is the credential, you said, is to make sure that they have the skill level. But if their credential is somewhere else, they have the skill level. Justice Sotomayor, they did not even comply with the transfer requirement. They did not comply with multiple health and safety requirements in the state. So part of what the credentialing ‑‑ Was this all before the district court? Yes. All right. And the district court looked at it and found explanations that were adequate for each and didn't come to the conclusions you did or the legislature did. I thought the standard of review for the Fifth Circuit here was whether there was a plausible basis in the record for the conclusions the district court reached. The district court judge ignored all of the health and safety violations. He ignored an entire category of courtesy privileges if we're talking about compliance. I would like to take us back to the point that they could and did get privileges. And their primary assumption from the beginning ‑‑ Before you do that, please, on this credentialing point, which you've mentioned several times, and of course Whole Women's Health discussed that and said a state can't say it's doing this for credentialing purposes if the hospital's reasons for denying admitting privileges have nothing to do with the doctor's quality. And that was true in Whole Women's Health, and it's true here, too, that there's a great deal of evidence in the record that indicates that admissions privileges rest on many things. It could rest on qualifications, but it could rest on the number of patients a doctor has. It could rest on whether a particular hospital needs more providers. It could rest on a general view that they don't want abortion providers in that hospital. So given that that's all true, it was true in Texas, and it's true here, it seems that Whole Women's Health precludes you from making this credentialing argument, doesn't it? No, I don't think that it does at all. In our case, it was demonstrably different. They could and did get privileges, so all of the conjecture and the speculation about the reasons why they might be denied privileges were proved to be untrue. They were able to get privileges. Is it not the fact that most hospitals in Louisiana, in order to get admitting privileges, you have to admit a certain number of patients? Abortion providers will never, if they're not also doing obstetrics and gynecology, they will never qualify because their patients don't go to the hospital. There's one finding in that respect that you can tell me if there's any dispute about it, but this circuit didn't seem to contest this finding of the year, or less than one for several thousand patients. Most of the people who get abortions never have any need to go to a hospital. Isn't that so? Justice Ginsburg, to your first point about the privileging and the minimum requirements, every set of bylaws in our record shows that there is a category of courtesy privileges that permits low admit from anywhere from zero to one. Is there anything inaccurate about this determination that access to a hospital was required far less than once a year, less than one for several thousand patients? Yes, it is inaccurate because what the record demonstrated is that they don't know what their complication rates are. They all testified that they don't know because women don't follow up or they don't follow up with women. So they really don't know what their complication rates are and they did testify that they had direct transfers that resulted in women having hysterectomies and hemorrhaging. Is it right that there's evidence in the record that Hope Clinic has served over 3,000 women annually for 23 years, so that's around 70,000 women, and has transferred only four patients ever to a hospital? And there is evidence in the record that they really don't know that that's an accurate rate because they don't track their complications. They really don't know what their numbers are. So they testified to that. They know whether they've transferred women to a hospital and it's four. I mean, I don't know of a medical procedure where it's lower than that of any kind. Justice Kagan, it's four that they know of and they don't track the numbers. You don't dispute that among medical procedures, a first trimester abortion is among the safest, far safer than childbirth? Justice Ginsburg, a first trimester abortion can be either medical or surgical, and even if it's medical, the doctor should have the qualifications to be able to handle the most likely complication of that procedure, which is a surgical abortion. So under the standard of care in Louisiana, even if it's a medical, even if it's a medication abortion, the doctor should be able to handle a surgical abortion and be qualified to do that. I think the record is questionable about whether DOE 1 can even do that. DOE 1, everybody agreed, including the Fifth Circuit, that DOE 1 is barred by this new law. The old law said that you have to have admitting privileges or a written transfer agreement. So it's a little hard to see how this improves anything since you had to have a written transfer agreement anyway. Isn't that true or not? Which DOE 1 did not comply with? But then I don't know why the Fifth Circuit Court of Appeals, which seemed to have problems with the My question is, we're not going to solve this in oral argument. I mean, what I've done, and I'm sure the others have, is I've gone through the district court findings, and I have gone through the Court of Appeals findings, and I have looked at the relevant bits of the record through my office, and we'll do more of that. So I think DOE 2 is your weakest case. I think there are others that are stronger. But I'd like your opinion, your opinion, about which of these DOEs is your strongest, and I'll be sure to look very carefully at that. Justice Breyer, I just want to understand your question. I'm saying which is strong. By the strongest, I mean you're trying to make an argument, and you have four DOEs that you have to deal with, okay? And so I want to know of your opinion, in respect to which DOE is your argument the strongest? Your argument is that the Fifth Circuit was right to overturn a fact finding, and with DOE 3, a credibility finding of the district court. That's your argument. Now, you have to support that, and I want to know in respect to which DOE do you feel it's the strongest support for you? And I go in order? Can I give you more time? You can give me all of them if you want, but you don't have that much time. And if you have a feeling off, you want to say they're all equally strong, fine. It's okay, you can say that, because I have an opinion about DOE 2, at least. And you can say what you want. Well, I mean, I think that there's evidence in virtually all of them that they sabotaged their own applications, and that DOE 5 obtained privileges in Baton Rouge and New Orleans, asked only one doctor to back him up in Baton Rouge, and all of the doctors agreed that is difficult to satisfy. DOE 2 simply... They don't all agree. I mean, that's, I don't think. But we're not going to get... All I want to know is a number, and the reason is we have limited time, and I could spend two hours discussing with you DOE 2, 3, 4. All I want to know is which should I look at especially hard? I would look at DOE 6, who applied to one out of nine hospitals in New Orleans. That's a good example. That's a great example, because he's the doctor who does only medical abortions, not surgical. He hadn't done a surgical procedure for over 12 years, and your state's own doc expert testified that it was not likely that he was going to get privileges anywhere, because he only did medical procedures, never saw a patient, in virtually all of the hospitals, if not all of them, even if there wasn't, like in Tulane, even if there wasn't a minimum number of patients that had to be admitted before you got privileges, you had to see a certain number of patients in the hospital per year to maintain your privileges, and he couldn't meet that requirement. So you talk about him applying to only one hospital in a situation where it was guaranteed that he couldn't meet the requirements of any hospital. My understanding of hospital practice today is you got to stay alive only if somebody sees patients, because if they don't see patients, they're of no value to the hospital. If the patients aren't admitted and there's no circumstance in which this doctor is going to get privileges. Justice Sotomayor, I think the record shows that they can get privileges, they did get privileges, and there's nothing in the bylaws that prohibits them from being given those privileges so much. But your own expert, Dr. Mariette, testified. It is unlikely that a doctor who, like those six, does what Justice Sotomayor said, would, quote, probably not, end quote, be able to obtain, quote, active admitting and surgical privileges, end quote. Now, that was your expert. And the basis of that and various other things, the district court finds that he didn't have to apply to all the hospitals because there was no point because your expert said he probably could not get them. And it's on the basis of that kind of thing that the district court held that he was likely not to be able to practice. Where does the Fifth Circuit able to say that that was clearly wrong? Justice Breyer, the Fifth Circuit did a searching review of the record just as it is instructed to do by Whole Woman's Health. And in the brief amount of time that I have left, I would like to say just one thing about standing. I think that the record is the reason why it demonstrates that these doctors should not be able to challenge a regulation that protects people, that is intended to protect a class of people from a certain type of activity. It's health and safety regulations. As a practical matter, and even yesterday this court was talking about the fact that consumers are protected by certain body of laws. That's what we are doing with health and safety regulations. How does that differ from Craig against Boren? Craig against Boren, first of all, had a beer buyer who was a first party plaintiff in the beginning of the case all the way through until it was on appeal. In addition to that, the state Yes, but he didn't count. The case rode on the owner of the Honk and Hollers standing. Craig turned 21. He was no longer subject to the law. Which is why I believe it's better characterized as a mutinous case, but I would also point out that the law at issue But standing, the court went on to the merits solely on the basis of the beer seller standing and you've had a state regulation that is ostensibly was designed to protect these vulnerable boys from drinking beer and getting into accidents. Very, very briefly, counsel. Justice Ginsburg, my answer to that is that the buyer in that case was much more just, it was much more just a financial transaction. Their interests were better aligned because he was not prohibited from consuming or possessing the alcohol. So it really wasn't health and safety. Thank you, counsel. General Wall. Mr. Chief Justice, and may it please the court. Petitioner's counsel began this morning by saying that this case is about respect for the court's precedence. But she went on to acknowledge two rather remarkable propositions that flow from the logic of petitioner's position and that are nowhere to be found in the court's cases. To you, Justice Alito, that the plaintiffs may bring this suit even if there is a potential or actual conflict of interest with Louisiana women. And to you, Justice Kavanaugh, that this law would be unconstitutional even if all providers in Louisiana already had admitting privileges or could easily get them. I do think, though, petitioners did acknowledge what is in the court's cases, which is to your question, Mr. Chief Justice, that the burdens may vary by state. At that point under the substantial obstacle test, we ought to be talking about those two, five, and six and how much of a burden there actually was on them instead of pivoting to the benefits. And to you, Justice Alito, that's not a clear error question. Nobody disputes what the doctors did. We're all agreed on the facts. There's no factual dispute about what the doctors did and didn't do. It's about how rigorously we're going to review their fairly modest efforts. Does this 30 mile, that's what I don't understand. I think everybody also agrees that the most likely place the woman will be if she needs to be in a hospital, she'll be at home. And her home has no necessary relationship with 30 miles from a clinic. So two points, Justice Ginsburg. Again, that's going straight to the benefits and bypassing the burdens, not looking first to whether there's a substantial obstacle, but to go straight to your question. All admitting privileges requirements, of which I'm aware, and they're fairly uncontroversial in the medical field, have some distance limitation. And I think the benefits that they go to, the most obvious is the continuity of care, right? Because you want the doctor to be able to admit them at some nearby hospital. And at least in some rural areas, there isn't always a hospital right around the road. So whether you draw it at 15 or 20 or 30 miles. And with respect to credentialing, it makes sense to think that the doctors... But it's just the post, starting out from the clinic where she won't be. She's not going to be at the clinic. That's often true, Justice Ginsburg. But the record here, unlike in Hellerstedt, reveals that sometimes it's not true, that sometimes women develop complications in the clinic. And in fact, Doe 3, who I think on this record is probably the most competent of the Does and is the medical director at Hope, said that he has, on occasion, had a patient who develops a problem like a perforated uterus and admitted in the hospital and treated it. So even Doe 3 thinks of that as a best medical practice. Now, granted, we don't know how often it happens. And Justice Kagan, I'm prepared to concede that it may not happen all that often. I don't think anybody knows the real rate. But the point is that it does happen. And when it does, it's very serious. In Louisiana... But it would never happen when you go to the clinic just to take two pills and go home. Well, if you develop a complication at home, it's not clear that you won't call the clinic and say to your doctor, I'm having a problem. And your doctor will say, then go to the following hospital where I have privileges. I'll meet you there. Now, that's not to say, as a patient, that's necessarily what you'd want. But it's hard for me to believe that women in Louisiana wouldn't at option to be treated by the doctor they saw at the clinic. Are you taking the position that there is no woman in Louisiana who doesn't feel burdened by this law? I'm taking the position that... No, no. Answer that question. Is there at least one potential woman, do you believe, that could bring this lawsuit? I assume that there are, but they have not seen... All right. So now stop a moment. Assuming, we assume, because it's logical, okay? The lives 300... There's going to be some woman who lives 330 miles away who's going to say, that's an unusually long period of time for me to have to drive and then drive back the same day. All right? But putting... Or the next day. Putting that aside, where is there a conflict between that woman and the doctor? If that woman is going to take the position that this law unduly burdens me, what's the potential conflict? She's going to come in and say, you doctors could get credentialing, so I really shouldn't sue. You doctors haven't really made an effort, so I really shouldn't sue. What sane woman who's a plaintiff is going to have a conflict with a doctor who wants to protect her rights by doing what they can to comply with the law or not, but their interests are not misaligned. They want to achieve the same holding, that this law unduly burdens her right to abortion. I don't see a conflict with that. I would say two things, Justice Sotomayor. Their interests are not necessarily aligned. One is the interest of for-profit providers and not being regulated in particular ways. The other is the interest of women in their own health and safety. Now, I don't know how those would have played out if the women had filed suit. I don't know how they would have... But please tell me what you imagine. But to give you a couple of examples, just to give you... It's not clear to me that women would have brought a facial challenge. Maybe all of the current providers in Louisiana... How do you deal with this? I mean, I have read the briefs. I understand there are good arguments on both sides. Indeed, in the country, people have very strong feelings, and a lot of people morally think it's wrong, and a lot of people morally think the opposite is wrong. And in Casey and the later cases, I think personally, the court is struggling with the problem of what kind of rule of law do you have in a country that contains both sorts of people? Not all right. So therefore, I take Casey as given. And I think eight cases where you've standing. I mean, we could go back and re-examine Marbury v. Madison. But really, we have eight cases in the abortion area. We have several cases in other areas. And Whole Women's Health picks that up. Casey picks that up. And you really want us to go back and re-examine this. Let's go back and re-examine Marbury v. Madison. And you have good arguments. But why depart from what was pretty clear precedent? I don't want to go back to 1789, Justice Breyer, but I do. You want to go back for 40 years? Well, I think what we want to say is that in none of those cases has the court ever considered and signed off in the face of a potential or actual conflict of interest. So yes, this is an argument that's never been in front of the court, and we don't think the court now faced with it should accept it. General, I know you have limited time. You know, I understand the point that the impact of the laws varies from state to state. But why do you look at each state differently if the benefits of the law, they're not going to change from state to state? So I disagree, Mr. Chief Justice. I think the variance isn't going to be as wide as on the burden side. But take credentialing, for instance. I think the petitioners would have to say that if you had a state that really did focus on hospitals really were vetting for competence, now they can dispute whether that happens here. I mean, that wasn't this case, right? Well, I would say that competence is, I think, a pretty key factor in what the hospitals do. And if you look at the joint ‑‑ On this record? I think if you look at the Joint Commission standards that are in the record. But my only point to the Chief Justice was that however we think about that, they can vary depending on how the credentialing system works in a particular state. If I could just make one last point on the merits. I don't really think it's a clear error standard, Justice Alito. It's how rigorously are we going to review pretty modest efforts? Doe 2 did not apply to a hospital where he used to have privileges and Doe 3 currently has privileges. Doe 5 got privileges at Toro Hospital in New Orleans and just needed to get a covering doctor in Baton Rouge. And Doe 6 didn't apply to Toro in New Orleans where Doe 5 has privileges. So Doe 5 did the thing that petitioners are here saying can't be done. And it's hard to figure out what the basis for distinction is. Because the sites they give in their brief, and it's pretty general and pretty thin, to be honest, but when you really trace it back, it seems to be the hospital bylaws. And Toro, as best we can tell, seems to have bylaws that look like the ones that they say would keep people from getting privileges. Answers. Each of those has an answer. I mean, they say, look, the ones who did get the privileges practice an OBGYN practice. And so they had women who in fact were admitted to hospitals. And the ones who don't are the ones who do medical abortion. You've heard that. And on the other one, as far as, I mean, Doe 2, Doe 2 says I tried to get a covering doctor. He said no. The other covering doctors, there's no point because I'm in Baton Rouge. Is that where he was? I think Doe 2. And he said, look, it's a tougher climate here. Really tough for people who perform abortions. Quite different from New Orleans. And I was told by one that don't do it because you try to get the covering doctor. And that doctor would be subject to picketing. Okay. We've all seen that. So we've gone through it. We'll go through it more. What do you want to say? So I think Doe 2 is in Shreveport. But far more importantly, what I'd say is this. In a pre-enforcement setting, that sort of debate back and forth isn't enough to carry the burden. What ought to have to happen is these physicians ought to have to put their applications where their mouths are. And then we'll find out once they've applied to the full range of hospitals whether they really can't. Whether Doe 2 really can't at Christus. Whether Doe 5 really can't find a covering doctor in Baton Rouge. Whether Doe 6 really can't at Toro. But on this record, I'm very skeptical that they can't. Is it not a reality, is it not really the fact that almost all hospitals in the state of Louisiana do have an admission, you have to admission record in order to admit patients. There's something in the record to that effect that you don't get, if you don't send patients to the hospital, you don't get admission privileges. You may answer. Justice Ginsburg, I think that's difficult to square with the fact that Doe 5, who does not have an OBGYN practice, got privileges at Toro. I think petitioners acknowledge that they're not explicit patient minimums. They call them implicit. But the kinds of requirements that they are pointing to are the sorts of things that look like they would have precluded Doe 5 and didn't. These ought to play themselves out in a post-enforcement context, not as here. Thank you, General. Five minutes, Ms. Rickleman. Your Honor, the lack of benefits of these laws is not state-dependent. The medical consensus is clear that in no state do they serve health and safety benefits. And in fact, even the federal government, a few months ago, removed an admitting privileges requirement from its regulations of surgery centers nationwide, finding that the requirement is medically unnecessary and imposes burdens. And as Justice Kagan asked, this was not the first time that rejected an alleged credentialing benefit in Whole Woman's Health. And after holding a trial, the district court rejected that this law would serve a credentialing benefit in Louisiana. With respect to burdens, the district court found that this law would be extremely burdensome, more so than the Texas law in Whole Woman's Health. And its finding that these physicians would not be able to get privileges is supported by at least four aspects of the record. The fact that they tried to get privileges at 15 hospitals over one and a half years under the court's supervision. The fact that the state's expert conceded that outpatient physicians who don't have a hospital-based practice are unlikely to get privileges. The fact that abortion access was thrown into chaos when this law actually took effect, and the hospital bylaws themselves, which included a variety of criteria that these physicians could never meet, including residency requirements. And finally, I'd like to point out that this is not, in fact, a pre-enforcement challenge. The state has recognized that, including in its state papers before this court, the district court allowed the law to take effect, but enjoined its penalties and supervised the physician's efforts to get privileges over a year and a half. Again, the state has previously acknowledged that this is not a pre-enforcement challenge. If there are no further questions. Thank you, counsel. The case is submitted.